# Coleman *v.* First National Bank of Decatur.

|115 307|
|131 638|

*Bill in Equity to enforce Vendor's Lien.*

1. *Sale of land; rescission for fraud; laches.*—Where fraudulent representations are the inducing motive to the execution of a contract for the sale of land, the party imposed upon can rescind the contract, provided the representations were of material facts and their falsity could not have been ascertained by the exercise of reasonable diligence; but there must be no unreasonable delay in exercising the right of rescission.

2. *Same; defect of title; payment of purchase money; possession of vendee.*—A vendee of land, in possession under a deed with covenants of general warranty or bond for title with such covenants, can not defend against the payment of the purchase money, at law or in equity, in the absence of fraud in the sale, or of the insolvency of the vendor, although the title may be defective.

3. *Same; evidence of fraud; case at bar.*—The testimony of the vendee that no representations were made as to the title except that it was good and a good deed would be made, that he did not know of the condition of the title and made no investigation of it, while that

[Coleman v. First National Bank of Decatur.]

of the vendor was to the effect that a full statement of the title was made to the vendee, the proof further showing that a good deed was afterwards tendered, although at the time of the contract of sale the vendor's title was not good, does not establish fraud.

4. *Possession of vacant lot.*—Possession of land depends upon its character and condition, and where the property is a vacant lot, the fact that the taxes on it were paid by a vendee under a bond for title, that he paid for placing a pavement in front of it and recognized and claimed the lot as his own, sufficiently establishes possession in such vendee.

5. *Rescission of contract of sale.*—The tender of the balance of the purchase money by a vendee under a bond for title, provided a good title is made, being met by the statement that the title could not be perfected at that time, and the failure of the vendee to keep the tender good, and also to offer to deliver up the possession of the land, together with his retention of the title bond, does not amount to a rescission of the contract.

6. *Same; laches.*—Where land is sold in 1887 and the vendee discovers that the title is defective the following year, but does not offer or attempt to rescind until March 31, 1894, such delay amounts to a waiver of the right of rescission.

7. *Vendor's lien; defective title made good before suit.*—It is no defense to a suit to enforce a vendor's lien that the title was defective at the time of the contract, when it is shown that a good title was tendered or could have been made before the institution of the suit.

APPEAL from the Chancery Court of Morgan.

Heard before the Hon. WILLIAM H. SIMPSON.

The bill in this case was filed by the appellee against the appellant, to enforce a vendor's lien. The facts of the case are sufficiently stated in the opinion.

Upon . the final submission of the cause, upon the pleadings and proof, the chancellor rendered a decree dismissing respondent's cross-bill, and holding that the complainant in the original bill was entitled to the relief prayed for. From this decree the respondent appeals, and assigns the rendition thereof as error.

HUMES, SHEFFEY & SPEAKE, for appellant.—1. It would be inequitable and unjust to enforce a specific performance of the contract against Coleman, six years or more having elapsed after the note became due, without anything being done to collect it—the value of the lot having enormously depreciated in the meantime, and Coleman's circumstances having undergone a change for the worse. "If through any unfair delay or neglect of

[Coleman v. First National Bank of Decatur.]

the promissor, the contract has not been executed until there has been a material rise or fall in the value of the property involved, it may become unconscionable to require a specific performance, and in such case equity will not do so; nor where, because of such a change in value or in the situation of the parties, from whatever cause, equitable relief would work a hardship on either side."—22 Amer. & Eng. Encyc. of Law, pp. 1029, 1048, notes; *Bryan v. Loftus*, 39 Amer. Dec. 242; *Rogers v. Sanders*, 33 Amer. Dec. 635; *Patterson v. Martz*, 34 Amer. Dec. 474; *Haggerty v. Elyton Land Co.*, 89 Ala. 428; *Reddish v. Miller*, 27 N. J. Eq. 514; *Smith v. Chasler*, 83 Ky. 367; *Brashier v. Gratts*, 6 Wheaton 528; *Holgate v. Eaton*, 116 U. S. 39, 40; *Davison v. Davis*, 125 U. S. 90; *Garnet v. Macon*, 10 Fed. Cas. 12, 20, 36.

2. Time is frequently considered not of the essence of an agreement to convey lands; but in all cases where the value of the property has materially changed, or where great financial changes have materially altered the relative value of money and land, time will be considered material, and a party will not be allowed to lie by until the change sets in his favor, and then ask for specific performance.—*Merritt v. Brown*, 19 N. J. Eq. 286; 22 Am. & Eng. Enc. of Law, p. 1048, note.

3. Where a defendant resisted specific performance of a contract to purchase land on the ground of a defect in the title, and afterwards the defect of the title was cured and a conveyance was again tendered and refused, it was held that after the time for the delivery of the deed had passed, the defendant would not be compelled, against his will, to accept a deed which he was ready and willing to accept at the time fixed for the performance of the contract, especially as the value of the real estate was depressed.—*Young v. Rathbone*, 16 N. J. Eq. 224; s. c. 84 Am. Dec. 151. Specific performance of a contract to convey land by warranty deed was refused to a *vendee*, when there had been a delay of only *six months*, and the value of the land had rapidly increased.—*C. & C. R. R. Co. v. Stewart*, 19 Fed. Rep. 5; *Combs v. Scott*, 70 Wis. 662.

JOHN C. EYSTER, *contra*.—1. The right of a purchaser of land to have a good title is a well established principle of law; and when parties contract for the sale of land,

[Coleman v. First National Bank of Decatur.]

the presumption of the law is, the purchaser intends to become the owner and is contracting for a good title. *Cullom v. Bank,* 4 Ala. 24; *Tobin v. Bell,* 61 Ala. 125.

2. It is conceded that the vendors did not have the title to the lot at the time of the sale, or at the time of the alleged tender, and so far as the contention in this case is concerned, it might also be conceded, that while there is no actual fraud on the part of the vendors charged or proved, if Coleman, the vendee, had manifested the election to disaffirm the contract of sale within a reasonable time after he discovered a want of title in his vendors, a court of chancery would have rescinded the contract.—*Duncan v. Jeter,* 6 Ala. 604; *Grigg v. Woodruff,* 14 Ala. 9; *Reed v. Walker,* 18 Ala. 323; *Foster v. Gressett,* 29 Ala. 393; *Kelly v. Allen,* 34 Ala. 663.

3. But this right of rescission on account of misrepresentation or fraud may be lost in at least two ways. 1st. By an affirmance of the contract after the discovery of the fraud. 2d. By the failure to manifest an election within a reasonable time after the discovery of the misrepresentation, or fraud, to disaffirm it.—*Foster v. Gressett,* 29 Ala. 393; *Kern v. Burnham,* 28 Ala. 428; *Dill v. Camp,* 22 Ala. 249. What is a reasonable time to disaffirm the contract and seek a rescission, must depend upon the circumstances of the particular case, but as a general rule, as was said in the case of *Kern v. Burnham,* 28 Ala. 428, whenever a party, with full knowledge of the fraud elects to treat a contract as a valid and subsisting one, he can not afterwards, in a court of equity, be allowed to dispute its validity.—*Thompson v. Lee,* 31 Ala. 303; *Griggs v. Woodruff,* 14 Ala. 16; *Park v. Brook,* 16 Ala. 529; *Lawrence v. Dole,* 3 Johns. Ch. Rep. 42; *Garrett v. Lynch,* 45 Ala. 204; *Lampkin v. Reese,* 7 Ala. 170; *Sheffield L., I. & C. Co. v. Neill,* 87 Ala. 158; *Lockwood v. Fitts,* 90 Ala. 154; *Gilmer v. Morris,* 80 Ala. 78; *Johnson v. Evans,* 50 Amer. Dec. 678.

4. It is a well established principle of law, and seems to be finally and definitely settled in this State, that a vendee who has gone into possession, either under a deed with covenants of warranty, or a bond stipulating for the conveyance of title with covenants of warranty, on the payment of the purchase money, can not, unless there was fraud in the sale to him, or the vendor is insolvent, and therefore without ability to respond to his

[Coleman v. First National Bank of Decatur.]

covenants, so long as he remains in possession, either at law or in equity, defend against the payment of the purchase money.—*Strong v. Waddell*, 56 Ala. 471 ; *Magee v. McMillan*, 30 Ala. 420.

5. If the view we have taken of this case is correct, the plea of tender, set up in the cross bill, is no defense against complainant's bill, even if the court comes to the conclusion that the tender was in fact made, as alleged. A vendee of land may tender the purchase money, according to his contract, when the note is due, and not before, and demand title, and if the vendor refuses, or is unable to make title, it will be a cause for a rescission of the contract.—*Clemens v. Loggins*, 1 Ala. 622. The plea of tender, to be good, must be accompanied by the payment of the money into court.—Code of 1886, § 2685 ; *Com. Fire Ins. Co. v. Allen*, 80 Ala. 571 ; *Park v. Wiley*, 67 Ala. 310.

6. If Coleman knew the condition of the title at the time he purchased the lot, this repels all imputation of fraud or misrepresentation, if any is charged in the cross bill.—*Teague v. Wade*, 59 Ala. 369 ; *Beck v. Simmons*, 7 Ala. 71 ; *Lampkin v. Reese*, 7 Ala. 170 ; *Barnett v. Gaines*, 8 Ala. 373 ; *Blanks v. Walker*, 54 Ala. 117.

HARALSON, J.—It is well settled, that "where one by the fraudulent representations of another, in relation to material facts concerning the title to land—the falsehood he had not the means of ascertaining, and could not have ascertained by reasonable diligence,—is induced to invest his money in the purchase of the land, he can have relief in chancery before an eviction, and without abandoning possession."—*Young v. Harris*, 2 Ala. 111 ; *Orendorff v. Tallman*, 90 Ala. 443.

In *Strong v. Waddell*, 56 Ala. 473, it was said : "The law ought to be regarded as finally and definitely settled in this State, after the numerous decisions declaring it, that the vendee who has gone into possession, under a deed with covenants of warranty, or a bond stipulating for the conveyance of title with covenants of warranty, on the payment of the purchase money, cannot, unless there was fraud in the sale to him, or the vendor is insolvent, and therefore without ability to respond to his covenants, so long as he remains in possession, either at law or in equity defend against the payment of the

purchase money."—*Wyatt v. Garlington*, 56 Ala. 576; *Burkett v. Munford*, 70 Ala. 423; *Thompson v. Sheppard*, 85 Ala. 612. In such a case, the vendee must rely upon his covenants of warranty.—*Meeks v. Garner*, 93 Ala. 20.

Although there may have been a defect in the title at the time of the agreement of the sale, if no fraud was practiced by the vendor, it will be a sufficient answer to a bill by the vendee to rescind on account of defects in the title at that time, that he had a valid title at the time title should be made, or at the hearing of the cause. *Meeks v. Garner, supra.;* Fry on Specif. Perf., p. 441.

Again it seems to be a principle of universal recognition, that if a party "desires to abandon or rescind a contract, by reason of a breach of it by the opposite party, or his inability to comply, [he] must act promptly and decidedly, upon the first discovery of the cause of rescission."—*Griggs v. Woodruff*, 14 Ala. 16; *Kilpatrick v. Henson*, 81 Ala. 468; *Allgood v. Bank of Piedmont, infra.*

The same rule on the subject, supported by a vast array of authorities, English and American, can not, perhaps, be better stated than it has been by Mr. Pomeroy, as follows: "When a party, with full knowledge, or at least with sufficient notice or means of knowledge of his rights, freely does what amounts to a recognition of the transaction as existing, or acts in a manner inconsistent with its repudiation, or lies by for a considerable time and knowingly permits the other party to deal with the subject matter under the belief that the transaction has been recognized, or freely abstains for a considerable length of time from impeaching it, so that the other party is thereby reasonably induced to suppose that it is recognized, there is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable in equity."—2 Pom. Eq. Juris., § 965.

The case, as made by the bill filed, is, that on the the 24th March, 1887, the defendant, Coleman, purchased from the defendants, Harris, Littlejohn and Moseley, for the sum of $1,500, lot number 64 in the town of Decatur, paid $500 in cash, gave his note for $1,000 payable eighteen months after date, and took from his vendors a bond for title, conditioned, "if the said Harris, Littlejohn and Moseley, on the payment of said promissory note above described, shall by deed alien and convey the

land above described to the said Daniel Coleman, his heirs or assigns, with covenants of general warranty, then this obligation shall be null and void, otherwise to remain of force."

The bill is filed by appellee to enforce the vendor's lien on the land, for the unpaid purchase money, evidenced by said note transferred to and owned by it. The vendee, Coleman, seeks to defend on account of an alleged defect of title in his vendors, by which they were unable to make him a good title, and by cross-bill seeks to have the sale rescinded, and the cash paid by him on purchase refunded.

1. Let it be said that there is no sufficient evidence to induce one to believe, that the vendors practiced any fraud or deceit on, or made any misrepresentations to, the vendee, in regard to their title to the lot, at the time the sale was made; but the contrary plainly appears. Coleman testifies: "I did not understand the condition of the title, when I bought the lot. I did not know, then, from whom this property had been purchased. There was no representation as to the title, except that the title was good and they would make me a good deed, when the balance of the purchase money was due and paid; that was all the representation in regard to the title." He says he made no examination of the records at the time. He thought he could do that at some other time. He also denies ever having been in possession of the lot.

Harris, one of the vendors, testified as to this matter: "Capt. Coleman came to me in Decatur, and wanted to invest in real estate. I told him about this property and our recent purchase of it from Capt. Hurd, and that we had sub-divided it into lots, and that it was selling very rapidly; in fact, at that time a considerable portion of it had been sold. * * * * My recollection is, I told him all about the purchase, the amount we were to pay for it, and had paid, and about the entire transaction with Capt. Hurd and the character of title we had. I made no representations to him other than in conformity with the character of our title. * * * This was during what was known as the 'boom days' of Decatur, when real estate was in great demand and large numbers of people were investing in real estate in and around Decatur. * * * There was not much differ-

ence between the prices of real estate at the time of the sale, and at the time the note matured, but at the time of the filing of the bill, prices had depreciated very much." Again he says: "At the time of Coleman's purchase from us, I have no distinct recollection of showing him our lease from Capt. Hurd, but I told him all about the manner in which we held the property, and represented the title precisely as it was."

2. Whether or not defendant ever had *pedis possessio* possession under his purchase, which he denies, it is sufficient to say that the lot was vacant, and possession could be no more definite than the character and condition of the land would permit. He paid the taxes on it for several years. The payment of taxes on land, it is true, is not of itself evidence of possession; but such evidence may, with other evidence, tend to show both a claim of ownership and the extent of claimant's possession, and is admissible in respect of actual possession.— *Green v. Jordan,* 83 Ala. 224; *Baucum v. George,* 65 Ala. 259, 269; *Jay v. Stein,* 49 Ala. 514. Coleman took from his vendors a bond for title to the lot, and besides paying the taxes on it for several years after the purchase, he paid for the placing of a pavement in front of the property. He also wrote afterwards of the property as "my lot."—*Nelson v. Shelby M. & I. Co.,* 96 Ala. 516.

3. His evidence, on the question of the rescission of his contract, tends to show, that he learned and knew the state of the title to the lot in May or June, 1888; that he received this information while abroad in France, made out in the handwriting of Judge E. H. Foster; that after he bought the lot, he ascertained that the title was not good, and that his vendors had only an optional purchase, and did not own the property. Upon hearing this fact, he did not offer to rescind. On the contrary, he wrote from France to Capt. Hurd, the vendor of his vendors, asking him to join them in a conveyance of the lot to him, referring to the same as "the property on which Mr. John Scott had a stand, and my lot is situated in the block which you sold them." He returned to the United States in October, 1889. His unpaid note fell due 24th September, 1889. He went to Decatur, as he deposes, on the 19th March 1890, and tendered to Moseley,—who, as he was told by Littlejohn, held the note,—the amount due thereon and interest, which ten-

der was made, provided he, Moseley, could make him a good deed, and Moseley told him the matter was in the same situation it had been all along. He also proved a similar tender made by his agent, Dr. Coleman, in February or March, 1889. Moseley testified that neither of the Colemans ever tendered him the purchase money for the lot, and never heard of defendant refusing to pay for the property until the summer of 1894. It is not pretended that a tender was made to either of the other vendors, and they deny any knowledge or information about it. They testify also, that they never heard of Coleman's refusal to pay the note until in 1894.

The defendant in his cross-examination says: "I never on any of my said visits to Decatur [after his return from Europe in 1889] offered to rescind or abrogate the contract or to return the lot in any way. I saw Harris, Littlejohn and Moseley frequently after I paid the taxes. I paid the taxes each year, including 1893. When I received the letter in 1894, I think the taxes were not due. I had made no offer to rescind up to that time. I had made a tender of the money before that, and had nothing more to say." The letter in 1894 to which he refers, was one from his vendors, dated March 10th, 1894, stating that they had not bothered him for a long time for the payment of his note owing to the closeness of money matters, and expressing the hope that he was then prepared to pay it. In his reply,—March 31, 1894,—he stated that "owing to your delay in perfecting title to the lot, and change of circumstances meantime in regard to it, notably great depression in its value, I must decline to recognize any liability to you on the note I gave for the balance of the purchase money." After stating the tender he had made, and their failure to make him a deed on account of incumbrance on the lot, he concluded by saying: "The delay is your fault, not mine; and I do not propose now, when the lot has depreciated so greatly in value, to recognize the contract, and I decline to pay the note."

This was the first distinct announcement made by him of anything like a repudiation or abandoment of the contract. He had not, up to this time, as he states, offered to rescind, had kept his title bond, made no offer to restore the property to the possession of his vendors, and to place them *in statu quo*, and never until the bill in

this case was filed, did he take any legal steps looking to a rescission. The fact that he had tendered the money due on his note,—which he admits he did not keep good by keeping it or other funds on hand after the tender,—was not an offer to rescind. Without more than he did, the contract being executory, and the payment of the note and the making of title by the vendors not being dependent conditions, and with nothing said about rescission, we are to presume he did not intend by the tender to offer to rescind, but that he made it, to get his title, which he desired to procure and not to abandon. If the property had appreciated in value after the tender, his vendors could not have set up what he did as a repudiation of his right to demand title.

4. The vendors of defendant, in their answer to the cross-bill, say that they are, and at all times have been, ready and willing, on the payment of the balance due on the purchase money for said lot, to give said Coleman a good and sufficient title to said lot, with covenants of general warranty; that they purchased the lot and others from Hurd, they paid a large amount of the purchase money, and had arranged with him to make title whenever they sold the property, or any portion of it, and the purchase money was paid. They show by their evidence that Hurd, on the 18th August, 1894, executed a deed to them for the lot in question and delivered the same to the First National Bank of Decatur, to be delivered on the payment of $1,500; and Harris, one of the vendors, in his deposition, states, that on the payment by defendant Coleman of his deferred purchase money, the deed will be delivered to him. Harris, as is shown, is the president of said bank.

It may be further added in this connection, that the proof tended to show, that these vendors with their wives, executed a deed containing covenants of warranty to said Coleman, and on the 6th February, 1888, sent the same and defendant's note to the First National Bank of Birmingham, to be delivered to his agent, Dr. Coleman, who resided there at the time, on the payment of said note; and on his declining to pay the same, it was returned to the bank in Decatur, through which it had been sent to the bank in Birmingham. It is to be noticed also, that there is no averment in the cross-bill, that the vendors of the lot to Coleman are insolvent, or

unable to make good their covenants for title to defendant. On the other hand, it does appear, that a valid legal title to the lot, from their vendor, executed before this bill was filed, had been delivered to the First National Bank Decatur, with instructions to be delivered to his vendees on the payment to him of $1,500, which payment they proposed to make, and deliver the deed with their own to the defendant, Coleman, on his paying his said note and interest, which at the date of the filing of the bill, amounted to over $1,500.

If the defendant ever had a right to rescind on account of defect in title to the lot, he waived it by his *laches* and want of diligence in asserting it, and the cross-bill is otherwise wanting in equity.

Affirmed.

BRICKELL, C. J., not sitting.

